**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**SHREVEPORT DIVISION**

| | |
|---|---|
| **DAVID B. MEANS, ET AL.** | **CIVIL ACTION NO. 5:23-cv-00669** |
| **VERSUS** | **JUDGE DAVID C. JOSEPH** |
| **DESOTO PARISH, ET AL.** | **MAGISTRATE JUDGE HORNSBY** |

**SECOND AMENDED COMPLAINT**

NOW INTO COURT, through undersigned counsel, come Plaintiffs, David B. Means, Ryan Dupree, Robert G. Burford, Robert Gross, Mary L. Salley, Martha Trisler, John F. Pearce, Joe Cobb, Jack L. Burford, Jack E. Barron, W. Bruce Garlington, Donald Barber, Billy Dwayne Brumley, and Sherry Brumley (collectively "Plaintiffs"), who file this Second Amended Complaint and aver as follows:

**NATURE OF THE ACTION**

1. Plaintiffs, individual registered voters of DeSoto Parish, Louisiana, challenge the redistricting plan adopted by DeSoto Parish reapportioning single-member voting districts for the DeSoto Parish Police Jury in accordance with the 2020 Census known as "Plan H (Revised)" (hereinafter the "Enacted Plan") as an unconstitutional racial gerrymander in violation of the Fourteenth Amendment.

2. Plaintiffs seek a declaratory judgment that the Enacted Plan violates the Fourteenth Amendment's Equal Protection Clause as an unconstitutional racial gerrymander. Plaintiffs also seek a preliminary and permanent injunction: (1) prohibiting the calling, holding, supervising, or certifying of any elections under the Enacted Plan; (2) setting a deadline for the enactment or adoption of a new redistricting plan for Police Jury districts in DeSoto Parish that complies with the Fourteenth Amendment; and (3) if necessary, appointing a special master to draw

1

constitutionally compliant Police Jury districts should no new constitutionally-compliant plan be enacted by the Court-ordered deadline, together with an award of Plaintiffs' attorneys' fees and costs incurred in connection with bringing this action.

**PARTIES**

3.      Plaintiff, David B. Means, is a resident of DeSoto Parish, Louisiana. He is a U.S. citizen and is a lawfully registered voter who resides in Police Jury District 4-A. Defendants used race as the predominant factor motivating their decisions to place a significant number of voters, like Mr. Means, within or outside of his district. As drawn under the Enacted Plan, Police Jury District 4-A is not narrowly tailored to satisfy the Voting Rights Act of 1965, 52 U.S.C. § 10101 *et seq.* (the "Voting Rights Act") or any other compelling interest.

4.      Plaintiff, Donald Barber, is a resident of DeSoto Parish, Louisiana. He is a U.S. citizen and is a lawfully registered voter who resides in Police Jury District 1-C. Defendants used race as the predominant factor motivating their decisions to place a significant number of voters, like Mr. Barber, within or outside of his district. Police Jury District 1-C is also overpopulated relative to the ideal population, which is evidence that race predominated in the drawing of District 1-C and other districts in the Enacted Plan. As drawn under the Enacted Plan, Police Jury District 1-C is not narrowly tailored to satisfy the Voting Rights Act or any other compelling interest.

5.      Plaintiff, Mary L. Salley, is a resident of DeSoto Parish, Louisiana. She is a U.S. citizen and is a lawfully registered voter who resides in Police Jury District 1-C. Defendants used race as the predominant factor motivating their decisions to place a significant number of voters, like Ms. Salley, within or outside of her district. Police Jury District 1-C is also overpopulated relative to the ideal population, which is evidence that race predominated in the drawing of District

1-C and other districts in the Enacted Plan. As drawn under the Enacted Plan, Police Jury District 1-C is not narrowly tailored to satisfy the Voting Rights Act or any other compelling interest.

6.      Plaintiff, Robert Gross, is a resident of DeSoto Parish, Louisiana. He is a U.S. citizen and is a lawfully registered voter who resides in Police Jury District 2. Defendants used race as the predominant factor motivating their decisions to place a significant number of voters, like Mr. Gross, within or outside of his district. Police Jury District 2 is also overpopulated, which is evidence that race predominated in the drawing of District 2 and other districts in the Enacted Plan. As drawn under the Enacted Plan, Police Jury District 2 is not narrowly tailored to satisfy the Voting Rights Act or any other compelling interest.

7.      Plaintiff, Robert G. Burford, is a resident of DeSoto Parish, Louisiana. He is a U.S. citizen and is a lawfully registered voter who resides in Police Jury District 4-A. Defendants used race as the predominant factor motivating their decisions to place a significant number of voters, like Mr. Burford, within or outside of his district. As drawn under the Enacted Plan, Police Jury District 4-A is not narrowly tailored to satisfy the Voting Rights Act or any other compelling interest.

8.      Plaintiff, Jack L. Burford, is a resident of DeSoto Parish, Louisiana. He is a U.S. citizen and is a lawfully registered voter who resides in Police Jury District 4-B. Defendants used race as the predominant factor motivating their decisions to place a significant number of voters, like Mr. Burford, within or outside of his district. As drawn under the Enacted Plan, Police Jury District 4-B is not narrowly tailored to satisfy the Voting Rights Act or any other compelling interest.

9.      Plaintiff, Ryan Dupree, is a resident of DeSoto Parish, Louisiana. He is a U.S. citizen and is a lawfully registered voter who resides in Police Jury District 4-B. Defendants used

race as the predominant factor motivating their decisions to place a significant number of voters, like Mr. Dupree, within or outside of his district. As drawn under the Enacted Plan, Police Jury District 4-B is not narrowly tailored to satisfy the Voting Rights Act or any other compelling interest.

10.     Plaintiff, Jack E. Barron, is a resident of DeSoto Parish, Louisiana. He is a U.S. citizen and is a lawfully registered voter who resides in Police Jury District 4-C. Defendants used race as the predominant factor motivating their decisions to place a significant number of voters, like Mr. Barron, within or outside of his district. As drawn under the Enacted Plan, Police Jury District 4-C is not narrowly tailored to satisfy the Voting Rights Act or any other compelling interest.

11.     Plaintiff, Billy Dwayne Brumley, is a resident of DeSoto Parish, Louisiana. He is a U.S. citizen and is a lawfully registered voter who resides in Police Jury District 4-D. Defendants used race as the predominant factor motivating their decisions to place a significant number of voters, like Mr. Brumley, within or outside of his district. As drawn under the Enacted Plan, Police Jury District 4-D is not narrowly tailored to satisfy the Voting Rights Act or any other compelling interest.

12.     Plaintiff, Sherry Brumley, is a resident of DeSoto Parish, Louisiana. She is a U.S. citizen and is a lawfully registered voter who resides in Police Jury District 4-D. Defendants used race as the predominant factor motivating their decisions to place a significant number of voters, like Ms. Brumley, within or outside of her district. As drawn under the Enacted Plan, Police Jury District 4-D is not narrowly tailored to satisfy the Voting Rights Act or any other compelling interest.

13.    Plaintiff, Joe Cobb, is a resident of DeSoto Parish, Louisiana. He is a U.S. citizen and is a lawfully registered voter who resides in Police Jury District 5. Defendants used race as the predominant factor motivating their decisions to place a significant number of voters, like Mr. Cobb, within or outside of his district. As drawn under the Enacted Plan, Police Jury District 5 is not narrowly tailored to satisfy the Voting Rights Act or any other compelling interest.

14.    Plaintiff, John F. Pearce, is a resident of DeSoto Parish, Louisiana. He is a U.S. citizen and is a lawfully registered voter who resides in Police Jury District 5. Defendants used race as the predominant factor motivating their decisions to place a significant number of voters, like Mr. Pearce, within or outside of his district. As drawn under the Enacted Plan, Police Jury District 5 is not narrowly tailored to satisfy the Voting Rights Act or any other compelling interest.

15.    Plaintiff, W. Bruce Garlington, is a resident of DeSoto Parish, Louisiana. He is a U.S. citizen and is a lawfully registered voter who resides in Police Jury District 6. Defendants used race as the predominant factor motivating their decisions to place a significant number of voters, like Mr. Garlington, within or outside of his district. As drawn under the Enacted Plan, Police Jury District 6 is not narrowly tailored to satisfy the Voting Rights Act or any other compelling interest.

16.    Plaintiff, Martha Trisler, is a resident of DeSoto Parish, Louisiana. She is a U.S. citizen and is a lawfully registered voter who resides in Police Jury District 6. Defendants used race as the predominant factor motivating their decisions to place a significant number of voters, like Ms. Trisler, within or outside of her district. As drawn under the Enacted Plan, Police Jury District 6 is not narrowly tailored to satisfy the Voting Rights Act or any other compelling interest.

17.    Defendant, DeSoto Parish, is a political subdivision of the State of Louisiana. It is comprised of eleven districts and governed by a council called a Police Jury. The Parish is the political subdivision responsible for propagating and implementing the Police Jury districts.

18.    Defendant, DeSoto Parish Police Jury (the "Police Jury"), is the governing council of DeSoto Parish and is composed of eleven Parish Jurors, each of whom represents one of DeSoto Parish's eleven districts. Parish Jurors in DeSoto Parish have responsibility for conducting redistricting for the Parish, including passing ordinances creating district boundaries and voting precincts after each decennial Census. (DeSoto Parish and DeSoto Parish Police Jury are sometimes hereinafter collectively referred to hereinafter as "Defendants").

## JURISDICTION AND VENUE

19.    This Court has original subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a)(3) because Plaintiffs' claims arise under the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

20.    Venue is proper in this jurisdiction pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to the claims in this case occurred in DeSoto Parish, Louisiana, which is in the Western District of Louisiana.

## FACTS

**A. Background.**

21.    In 2011, the Secretary of Commerce released Louisiana's unofficial redistricting data file, including the data for DeSoto Parish.  This information was used to create the 2010 redistricting map for the Parish.

22.    During this 2010 redistricting cycle, Cedric Floyd served as the consultant to the DeSoto Parish Police Jury and was responsible for preparing the 2010 redistricting map.

23.    Mr. Floyd did not adhere to numerous standard redistricting practices in the creating of the 2010 map.

24.    Specifically, the map he prepared resulted in Police Jury districts that exceeded the maximum allowable total population deviation of ten percent.  The map underpopulated Black majority-minority districts while overpopulating White Majority districts.  Pockets of Black population were linked by elongated, irregular district boundaries stretching between northern areas of the Parish and the City of Mansfield. Communities of interest, particularly those located in smaller towns and villages, were disregarded and fractured into multiple Police Jury districts, thereby diluting their voting strength in favor of enhancing Black voting strength.

25.    The configuration and population deviations present in the 2010 map provide direct evidence that race predominated in the drawing of district boundaries.

26.    On March 12, 2020, the 2020 Census was commenced by the U.S. Census Bureau. Due to the COVID-19 pandemic, the Census Bureau suspended its operations until July 2020 and officially ended its operations on October 15, 2020.

27.    On April 26, 2021, the U.S. Department of Commerce submitted the 2020 Census counts to the President of the United States for purposes of apportionment.

28.    On August 12, 2021, the Secretary of Commerce released Louisiana's unofficial redistricting data file, including the data for DeSoto Parish.  The data in final format was released on September 16, 2021.

**B.  Results of the 2020 Census.**

29.    Based on the results of the 2020 Census, DeSoto Parish was one of 19 Louisiana parishes that grew in population from 2010 to 2020, with most of the growth occurring at the north end of the parish, near and around Stonewall, Louisiana. By contrast, the population of Mansfield,

7

Louisiana, declined between 2010 to 2020, and has experienced a steady decline in population since before 2010.

30.    According to the 2020 Census, DeSoto Parish had a population of 26,812 on Census Day, which was an increase of 0.6% from its 2010 population count. Of this population, 15,284 (57.00%) were people who replied to the Census Bureau as being White, and 9,973 (37.19%) were people who replied to the Census Bureau as being all or any part Black. The City of Mansfield has a total population of 4,714 persons, with a total Black population percentage of 80.6%.

31.    An ideal population total in each Police Jury district is 2,437 people. This figure is arrived at by simply taking the total number of Parish residents (26,812) and dividing by the total number of Police Jury Districts (11).

**C.  DeSoto Parish Adopts, and Then Rescinds, Plan C.**

32.    The Police Jury is the governing council of DeSoto Parish and is composed of eleven Parish Jurors, each of whom represents one of DeSoto Parish's eleven districts. Parish Jurors in DeSoto Parish have responsibility for conducting redistricting for the Parish, including passing ordinances creating district boundaries and voting precincts after each decennial census.

33.    In response to the population growth that took place between 2010 and 2020, DeSoto Parish Police Jurors worked with DeSoto School Board Members and DeSoto Parish's redistricting consultant and demographer, Mike Hefner to redraw Parish election district lines. Although both the DeSoto Police Jury and the DeSoto School Board each have 11 elected representatives, their election district lines are not coterminous.

34.    On April 18, 2022, the Police Jury unanimously adopted an Ordinance approving Reapportionment Plan C (which was prepared by DeSoto Parish's redistricting consultant Mr. Hefner) at the Police Jury's meeting in Regular Session ("Plan C"). This plan retained five

8

majority-Black districts based in Mansfield, Louisiana, which was the same number adopted in the previous redistricting cycle. This means that the portion of the Voting Age Population ("VAP") Count that is "Any part Black" is a majority of the total VAP for those five districts.

35.    The Police Jury's redistricting consultant, Mr. Hefner, explained that because the Stonewall area in northern DeSoto experienced the most significant population growth in the Parish from 2010 to 2020, that area dominated the plan design because there was so much population to redistribute to the surrounding districts. In fact, the growth was so significant in northern DeSoto that Hefner indicated he could have easily taken the excess population and created another Police Jury district there.

36.     Mr. Hefner explained that he stretched boundaries of districts located in the south and east portions of DeSoto Parish toward the north of the map to redistribute portions of the populous Stonewall area to surrounding districts, describing it as a domino effect from south going north. Even still, Mr. Hefner admitted that districts drawn in the northern portion of the Parish were overpopulated relative to the districts in the south, where population had declined. However, his stated purpose in drawing the Plan C boundaries this way was to ensure that minority representation in the Police Jury did not decline.

37.    In fact, according to the Police Jury's public notice of its adoption of Plan C, the Police Jury indicated that it "undertook an effort to realign the election districts to balance the population counts and maintain minority representation in accordance with Section 2 of the Voting Rights Act of 1965 and applicable state statutes."[1]

---

[1] DeSoto Parish Police Jury Public Notice, Adoption of Reapportionment Plan C (May 5, 2022), available at https://louisianapublicnotice.com/notices/198114 (last visited May 17, 2023).

38.    There is no indication that, prior to adopting Plan C, the Police Jury hired any qualified expert to perform an analysis of the Voting Rights Act as required by the U.S. Constitution—including a compactness or racially-polarized-voting analysis.

39.    Plan C created excess deviations between high and low populations in numerous Police Jury Districts in DeSoto Parish. Many of these deviations exceed the 10% threshold, making the plan constitutionally suspect under the "one person, one vote" principle of the Fourteenth Amendment. For instance, the district with the largest population under Plan C, District 5, was a majority-White district (71.46% White) in northern DeSoto, whereas the district with the lowest population, District 6, was a majority-Black district (57.32% Black). These districts were adjacent to each other.

40.    After Plan C was adopted, the maximum total deviation between majority-White and majority-Black Police Jury Districts was 17.56% between District 5 (majority White) and District 6 (majority Black), exceeding the 10% threshold for a presumptively inequitable population apportionment. In fact, the total deviation between majority-White and majority-Black districts under Plan C exceeded 10% for the following combinations of districts in DeSoto Parish:

**DeSoto Plan C Districts' Total Deviation from Ideal Population**

| Majority-White District | Majority-Black District | Total Deviation |
|---|---|---|
| District 1 | District 4-D | 10.38% |
| District 1 | District 6 | 13.83% |
| District 2 | District 4-D | 11.00% |
| District 2 | District 6 | 14.44% |
| District 5 | District 4-A | 10.75% |
| District 5 | District 4-B | 12.60% |
| District 5 | District 4-C | 10.25% |
| District 5 | District 4-D | 14.12% |
| District 5 | District 6 | 17.56% |

41.     The Police Jury achieved these racial population deviations by overpopulating *every* majority-White district and under-populating *every* majority-Black district in DeSoto Parish relative to the ideal population of 2,437 persons.

42.     On November 18, 2022, a group of concerned residents of DeSoto Parish, including many of the Plaintiffs here, delivered a letter to DeSoto Parish indicating that Plan C violated the Fourteenth Amendment through its unequal population deviations, racial gerrymandering, and intentional discrimination on the basis of race. These Parish residents indicated that Plan C failed to address the recent population growth in the northern portion of DeSoto Parish in a race-neutral manner. Accordingly, they demanded that the Parish either resolve these issues or that they would have to resort to litigation.

43.     In response to their letter, the Police Jury's demographer Mr. Hefner indicated his position was that Section 2 of the Voting Rights Act required that any new plan the Police Jury adopted could not put minority representation in the Parish in a worse position than it had been under the previous redistricting cycle's map adopted a decade earlier—effectively Mr. Hefner argued that no plan could retrogress the number of majority-minority Police Jury districts. Despite this admission that the lines were drawn to preserve the number of majority-minority districts, he perplexingly disagreed that the districts had been racially gerrymandered as drawn in Plan C.

44.     The act of drawing district lines to ensure that the number of majority-minority districts in a given map does not decrease—as the DeSoto Police Jury approved with Plan C—is a *per se* example of racial predominance in redistricting.

45.     After receiving the Parish residents' November 18 letter, the Police Jury held a special meeting on December 5, 2022. At that meeting, the Police Jury voted unanimously to rescind Plan C.

11

**D. DeSoto Parish Adopts the Enacted Plan With the Expressed Intention of Maintaining Five Majority-Minority Districts.**

46.     On December 15, 2022, the Police Jury held a public workshop with Mr. Hefner to consider alternative maps. Mr. Hefner presented a new proposed map, showing the jurors the impact of various adjustments to the redistricting plan like adding and subtracting census blocks. During the presentation, Police Juror Kyle Kennington, who represents a district in northern DeSoto, pointed out that all of Mr. Hefner's adjustments left all districts in the northern portion of the parish overpopulated. Mr. Hefner indicated that any adopted plan would need to attempt to maintain minority representation, and not weaken it, and explained that one of his specific aims in drawing his map was to avoid lowering the total minority population in majority-minority districts.

47.     Also during the December 15 meeting, Parish District Attorney Charles Adams, a former judge, reviewed with the Police Jury a large number of U.S. Supreme Court cases regarding the Fourteenth Amendment, racial gerrymandering, and the Voting Rights Act's requirements that addressed similar issues as those faced by DeSoto Parish. Mr. Adams indicated to the Police Jury that protecting incumbents and preventing minority retrogression are insufficient under the Fourteenth Amendment to justify moving people in or out of districts based on their race unless there is evidence presented to the Jury that proves a Voting Rights Act Section 2 violation. Mr. Adams warned that because courts are not concerned with a map-drawing body's good intentions, it is important that the Jury not draw the lines based upon race. Mr. Adams further admonished the Police Jury of the importance of adhering to traditional districting criteria and addressing the fact that the population in DeSoto Parish was changing, with increased population in the northern part of the parish, and that it needed to shift the concentration of people northward more than it had.

48.     President Ernel Jones took a different position from Mr. Adams during the meeting. President Jones read excerpts from a letter the Police Jury received from the NAACP Legal

12

Defense and Educational Fund, and opined that eliminating one of the five majority-minority districts already in existence would significantly put the Police Jury in significant legal jeopardy because those lines had been previously approved by the Justice Department.

49.    Mr. Hefner similarly disputed Mr. Adams's research, asserting that the case law Mr. Adams cited was not applicable to DeSoto Parish's attempt to maintain existing majority-minority districts, but instead only applies to when a state is attempting to create an additional minority district. Mr. Hefner did acknowledge that DeSoto Parish has experienced highly imbalanced population shifts over the last decade, with a large number of people moving into northern DeSoto Parish and with significant population decline in southern DeSoto Parish. Despite these changes, he asserted that the Parish's safe harbor was to maintain its existing majority minority districts. He also asserted that the Voting Rights Act imposes an obligation to keep incumbents within their existing districts even though several of them live there very close to each other in Mansfield. Regarding recent population shifts, Police Juror Jeri Burrell of Mansfield observed that the issue largely resulted from predominantly White people migrating to the northern end of the parish and segregating themselves. At the end of the meeting, Mr. Hefner said he would take the revised plan and work on it further.

50.    On January 19, 2023, the Police Jury held another redistricting working session, where race was heavily considered during deliberations over what would become "Plan H (Revised)" (the "Enacted Plan"). Additionally, concerns raised by police jurors from northern DeSoto districts about imbalanced population numbers were largely disregarded. For instance, Police Juror Kyle Kennington said that it did not make sense to overpopulate his and Greg Baker's districts in northern DeSoto when numerous new subdivisions were already being developed there, meaning the populations would only continue growing. Mr. Hefner responded that the density of

13

the Stonewall area made it difficult to balance out the districts' populations. The Police Jury considered but ultimately rejected the proposal to create a 12th district in the northern portion of the Parish.

51.    In late January 2023, Mr. Hefner submitted Plan H (Revised) for the Police Jury's consideration, which maintains five majority-Black districts (Districts 4-A,  4-B, 4-C, 4-D, and 6) while reducing the population deviations below the presumptively unconstitutional 10% threshold that had been exceeded under Plan C. Similar to Plan C, however, each of these five districts extends out from Mansfield, with several districts stretching out to include distant rural areas with little connection to Mansfield.

52.    On February 3, 2023,  residents of DeSoto Parish, including many of the Plaintiffs here, wrote a letter to the Police Jury indicating that although the Enacted Plan appeared to resolve the unconstitutional population deviations that existed under Plan C, the district boundaries in the Enacted Plan would violate the Fourteenth Amendment's prohibition against racial gerrymandering because they deviate from traditional race-neutral redistricting principles, including using boundaries with jagged tendrils to force the five district boundaries into the City of Mansfield, with the predominant purpose of maintaining five majority-Black districts.

53.    These Parish residents instead proposed that the Police Jury adopt an alternative remedial map prepared by demographer Dr. Gary Joiner ("Proposed Plan") which only split the City of Mansfield once into two districts.  They also indicated that the Proposed Plan more effectively reflected recent population growth that had taken place in the northern third of the Parish (particularly Stonewall) while adhering to traditional districting criteria like compactness, maintaining communities of interest while minimizing pairing of incumbents. They then submitted

14

the Proposed Plan in pdf format on February 3 to the Police Jury, and in shape file format on February 8.

54.    On February 21, 2023, the Police Jury had another public meeting. Three maps were presented and considered at the meeting: Mr. Hefner's Plan H (Revised), Dr. Joiner's Proposed Plan, and demographer Cedric Floyd's proposed map (called Plan CC). In contrast with Dr. Joiner's plan that only divided Mansfield between two Police Jury Districts, both Mr. Hefner's and Mr. Floyd's proposed maps continued to divide Mansfield between five districts using jagged tendrils and distantly spread boundaries as had been done under Plan C.

55.    In Mr. Floyd's presentation, he indicated that if the Police Jury reduced the number of majority-Black districts, that would constitute retrogression and vote dilution in violation of the Voting Rights Act.

56.    In Dr. Joiner's presentation, he indicated that the Enacted Plan is constitutionally problematic because (1) race was the predominant consideration in drawing it, (2) it fails to adhere to numerous traditional districting principles like compactness and preserving communities of interest, and (3) it fails to account for significant population growth in the northern portion of the Parish.

57.    After the demographers' presentations and during deliberations, Parish District Attorney Mr. Adams reminded the Police Jury and the public of his presentation he made at the December 15, 2022 meeting and that Supreme Court precedent prohibits local governments from segregating citizens or drawing voting districts simply on the basis of race absent extraordinary justification, and that any effort to do could not be defended in a court of law. He stressed that the reason the Police Jury had provided, *i.e.*, that it was attempting to comply with the Voting Rights Act, is insufficient unless the Parish has actual proof, not just the allegation of a Voting Rights Act

15

violation. In response, Police Juror Jeri Burrell retorted that it appeared to her that Mr. Adams was advocating for the people who had raised the complaint against Plan C (*i.e.*, many of the Plaintiffs here) rather than for the interests of DeSoto Parish.

58.    The Police Jury voted on the Enacted Plan at the February 21 meeting, but it did not obtain enough votes for adoption. The Police Jury announced that it would hold a workshop to review the maps again with each of the three demographers. However, despite the concerned Parish residents' efforts to schedule that workshop for Dr. Joiner to present his map to the Police Jury, the workshop with all three demographers never took place.

59.    On March 20, 2023, the Police Jury held a non-public executive strategy session to discuss the ongoing redistricting deliberations over Police Jury districts and prospective litigation.

60.    On April 10, 2023, over four months after the original Plan C was rescinded, the Police Jury held a public redistricting workshop and special meeting immediately following. At the meeting, the Police Jury voted on whether to adopt the Enacted Plan or Mr. Floyd's Plan CC. Mr. Floyd was given the opportunity to present in favor of Plan CC at the meeting. Dr. Joiner was not invited to present at the meeting, and the  Proposed Plan was not included for a vote. The Police Jury voted in favor of adopting the Enacted Plan (sometimes referred to by police jurors at the meeting as "Plan H (Revised)" or "Plan HH") by a vote of seven to four and adopted the Ordinance reapportioning the Parish Police Jury. The following map depicts the Enacted Plan as adopted:

16



61.     The Police Jury's actions have already caused numerous registered voters in DeSoto Parish, including multiple Plaintiffs, to receive incorrect voter registration cards indicating that their residence is located in their former district under previous boundary lines rather than the appropriate updated district under the Enacted Plan.

62.     Elections for the Police Jury are currently scheduled for October 14, 2023 (primary elections), with the candidate qualifying period scheduled for August 8-10, 2023.[2]

**E.  The Enacted Plan Was Gerrymandered on the Basis of Race.**

63.     Similar to Plan C, DeSoto Parish's adoption of the Enacted Plan created five majority-Black districts by intentionally under-populating majority-Black districts and

---

[2] Louisiana Secretary of State, 2023 Elections, available at https://www.sos.la.gov/ElectionsAndVoting/Published-Documents/ElectionsCalendar2023.pdf (last visited May 17, 2023).

overpopulating majority-White districts and blatantly deviating from traditional redistricting criteria in order to maximize Black VAP in those five districts.

64.    It is clear from the public comments of the Police Jury and the Jury's demographer that the Jury believed it could not create a plan with less than five majority-Black VAP districts.

65.    It is also clear from the public comments of the Jury and the Jury's demographer that the Jury believed, despite the advice given to it by its own counsel, that to create less than five majority-Black CVAP districts would result in "retrogression" and/or a violation of Section 2 of the Voting Rights Act.

66.    The non-retrogression provisions of the Voting Rights Act are pursuant to Section 5, which is no longer enforceable since the U.S. Supreme Court in 2013 struck down the coverage formula in Section 4(b) as unconstitutional. *Shelby County v. Holder*, 570 U.S. 529, 551 (2013).

67.    It is also clear from the public records and comments that the Police Jury did not do an analysis of whether Section 2 required five majority-minority districts in the Parish.

68.    In addition to the direct evidence of racial predominance described above, there is abundant circumstantial evidence from the racially gerrymandered manner the Enacted Plan was drawn demonstrating that race was the predominant consideration in drawing the Enacted Plan. When the direct and circumstantial evidence are considered together, predominant racial intent is plainly apparent. The Enacted Plan is an unconstitutional racial gerrymander.

69.    Although the Enacted Plan no longer contains population deviations exceeding the 10% threshold of being constitutionally suspect for purposes of the Fourteenth Amendment's "one-person one-vote" requirement, population deviations still persist and reveal a pattern of racial predominance in drawing the map.

18

70.      Specifically, four of the five majority-Black districts have population totals below the ideal population of 2,437 people. Voting strength is enhanced when a district's total population is lower because voters in those districts are overweighted in each case compared to the other districts in the Parish. This is particularly true in majority-Black Districts 4-A, 4-D, and 6 (under-populated by -4.14%, -4.35%, and -4.72% respectively), as seen in the below table of population deviations.

**%18+_AP_BLK By District**

| District | Pop | Dev | % Dev | 18+_Pop | % 18+_Pop | 18+_Wht | % 18+_Wht | 18+_AP_Blk | % 18+_AP_Blk |
|---|---|---|---|---|---|---|---|---|---|
| 1A | 2515 | 78 | 0.032007 | 1781 | 0.708151 | 1485 | 0.590457 | 194 | 0.077137 |
| 1B | 2494 | 57 | 0.023389 | 1924 | 0.771451 | 1309 | 0.52486 | 517 | 0.207298 |
| 1C | 2520 | 83 | 0.034058 | 2005 | 0.795635 | 1664 | 0.660317 | 259 | 0.102778 |
| 2 | 2461 | 24 | 0.009848 | 1775 | 0.721252 | 1483 | 0.602601 | 156 | 0.063389 |
| 3 | 2528 | 91 | 0.037341 | 1857 | 0.734573 | 1502 | 0.594146 | 200 | 0.079114 |
| 4A | 2336 | -101 | -0.041444 | 1767 | 0.756421 | 615 | 0.263271 | 1097 | 0.469606 |
| 4B | 2554 | 117 | 0.04801 | 2033 | 0.796006 | 693 | 0.271339 | 1237 | 0.484338 |
| 4C | 2349 | -88 | -0.03611 | 1847 | 0.786292 | 656 | 0.279268 | 1120 | 0.476799 |
| 4D | 2331 | -106 | -0.043496 | 1798 | 0.771343 | 513 | 0.220077 | 1195 | 0.512656 |
| 5 | 2402 | -35 | -0.014362 | 1855 | 0.772273 | 1323 | 0.550791 | 388 | 0.161532 |
| 6 | 2322 | -115 | -0.047189 | 1798 | 0.774332 | 666 | 0.286822 | 1062 | 0.457364 |

Consequently, most majority-White districts are overpopulated, particularly in the northern portion of the Parish, resulting in the dilution of those districts' voting strength via packing them with larger populations.

71.      Additionally, while the original benchmark map from the previous cycle was comprised of 33 total Voting Tabulation Districts ("VTDs")[3] in DeSoto Parish, the Enacted Plan added 38 new VTDs (all with names ending in a letter), more than doubling the original number. As described further *infra*, the original VTDs were often split in awkward or unusual ways

---

[3] "Voting Tabulation Districts" is the census term for the much more commonly used "precincts." *See* Census Bureau Geography, Chapter 14, https://www2.census.gov/geo/pdfs/reference/GARM/Ch14GARM.pdf.

19

deviating from traditional redistricting criteria, to aggregate VTDs with a higher Black population and exclude VTDs with a lower Black population to cobble together five majority-Black districts.

72.     Regarding the district boundaries themselves, in each of the majority-Black districts (Districts 4-A, 4-B, 4-C, 4-D, and 6),  VTDs were divided up to either maximize Black voting percentages and to reduce non-Black voting strength within the VTDs or to split up White VAP in high majority-White VTDs.

73.     The unusual lizard-tail-shaped boundaries of Police Jury District 4-A were carefully drawn based on the racial composition of the VTDs, *i.e.*, in an effort to aggregate VTDs with a higher Black population and exclude VTDs with a lower Black population to form a majority-Black district. For instance, VTD 26A was cut from VTD 26 with precision to exclude as much White population as possible by putting it into VTD 26A while cherry picking pockets of higher Black population to add to VTD 26, and thus to District 4-A. The boundaries of VTD 26 were even extended north of U.S. Interstate I-49 via a narrow 644-foot corridor to include a pocket of higher Black VAP on the other side of I-49, creating a bizarre hourglass-shaped VTD 26, as reflected in the below map. Race was the driving force in the use of precinct splits to draw District 4-A in this manner.



74.    Similarly, the boundary of Police Jury District 4-B was precisely drawn based on the race of the VTDs in an apparent effort to maximize high-Black-population VTDs in that district. Indeed, there is almost a perfect match between the racial demographics of the VTDs in District 4-B and the boundaries that were drawn.

75.    Specifically, the Police Jury split up precincts in targeted ways to achieve its racial quotas. For instance, Precinct 37 was split to include three new additional precincts; two of these, Precincts 37A and 37C (all with less than 40% Black VAP) were used to create a narrow isthmus connecting the high Black populations east of the village of Longstreet and at the northwestern tip of District 4-B to the high Black VAP in Mansfield in the southeastern portion of District 4-B.

76.    The Police Jury drew VTDs deliberately in a manner that would sever the Black population from their original VTDs to include in District 4-B for the purpose of creating a majority-Black district.

77.    Indeed, a look at the bizarrely-shaped District 4-B and its racial composition yields the apparent conclusion that race predominated in its drawing:

**DeSoto Parish Police Jury District 4-B (in Purple)**



**DeSoto Parish Police Jury District 4-B Black VAP**



78.    The northward extension in District 4-B to include a VTD with a greater than 60% Black VAP at its northern most edge creates an isolated tendril shape that is a clear deviation from the principle of compactness. This jagged tendril causes District 4-B to score particularly poorly on both compactness and compression tests, particularly considering other available surrounding populations that could have been chosen to include in the district to avoid it. This oddity alone yields a conclusion that race was the predominant factor in drawing District 4-B.

79.    The same pattern of racial predominance is evident in District 4-C. The boundary of District 4-C was precisely drawn to create a majority-Black district: every VTD in this district has a Black VAP of 40% or higher, and there is an almost perfect match between the racial demographics of the VTDs in this District and where the boundary line is drawn. Furthermore, DeSoto Parish's consultant made the unusual decision to split VTD 26 to remove VTD 26A with its 59.09% White VAP from District 4-C while keeping the significant Black VAP from the

23

remaining VTD 26 to increase the overall Black population of District 4-C. These factors collectively indicate that race predominated in the drawing of District 4-C.

80.     The boundary of District 4-D was also precisely drawn to follow the race of the VTDs, demonstrating that race predominated in drawing the Enacted Plan. There is a nearly perfect match between the racial demographics of the VTDs and where the district line is drawn: every VTD in District 4-D contains 60% or higher Black VAP, with the exception of VTD 46B, which has a Black VAP of 42.26%. Particularly problematic is the suspicious shape of VTD 44, with its crescent-wrench shape at the northwestern edge of the District, that was drawn to exclude VTD 44A from the District, causing VTD 44A to appear like an object in the vice of that crescent wrench shape, as seen in the below map.  The Police Jury excluded VTD 44A with its 70.96% White VAP, while including the adjacent VTD 44 with its 69.91% Black VAP.

**DeSoto Parish Police Jury District 4-D Black VAP**

81.     This targeted splitting of VTDs to include a new VTD with a nearly 70% Black VAP while excluding a VTD with a more than 70% White VAP, especially when oddly-shaped

24

boundaries were used to accomplish it (*i.e.*, VTD 44A appears like an object in the vice of a crescent-wrench, VTD 44), demonstrates that race was the predominant factor in drawing the lines of District 4-D.

82.     Finally, the boundary of District 6 was also drawn to precisely follow the race of the VTDs. Indeed, there is almost a perfect dichotomy between the racial demographics of the VTDs in rural and urban locations and where the district lines are drawn. District 6 employs jagged tendrils to include high Black VAP in the southern portion of the City of Mansfield, while also using long and winding boundaries to cover large rural areas. This causes District 6 to surround District 4-C on three sides. These unwieldy, geographically spread-out boundaries are suspicious because the vast majority of District 6's population is located in the southern portion of the City of Mansfield which is not a community of interest with those other distant and disparate rural communities. These facts all demonstrate that race predominated in the drawing of District 6.

83.     As evident in the Enacted Plan City of Mansfield map below, each of DeSoto Parish's majority-Black districts (4-A, 4-B, 4-C, 4-D, and 6) extend out from the densely populated majority-Black City of Mansfield to include rural areas with a negligible effect on the total VAP. In particular, Districts 4-A, 4-B, and 6 awkwardly use jagged tendrils to force the districts into position in the City of Mansfield, giving a contrived appearance to all three districts. This can be seen in the below map of the Enacted Plan zoomed in on Mansfield, with Mansfield's municipal boundaries outlined in red, and with District 4-A colored yellow, 4-B colored purple, 4-C colored green, 4-D colored blue, and 6 colored red.

**DeSoto Parish Police Jury Plan H Revised and Municipal Boundaries**



84.     According to the 2020 Census, the City of Mansfield had a total population of 4,714 persons, with a total Black population percentage of 80.6%. By contrast, DeSoto Parish as a whole had a population of 26,812 persons according to the 2020 Census. Accordingly, as a result of these deviations from traditional redistricting criteria evident in each of these majority-Black districts, the effect of the Enacted Plan is that the City of Mansfield controls five of the eleven Police Jury districts in DeSoto Parish, even though it only comprises 17.58% of the parish's total population.

85.     Notably, the Enacted Plan used significant precinct splitting to create an additional thirteen VTDs beyond the eleven original VTDs in and near the City of Mansfield. Of these, only one was less than 40% Black VAP (44A). For instance, VTD 6A was created in Mansfield to form a VTD with a population of 109, of whom 104 were Black. This excessive use of precinct splitting

to create each of these suspicious VTDs (especially VTDs 6A, 6B, 6C, 6D, 9B, 9C, 59A, and 63A) was done to provide additional Black VAP to bolster the Police Jury's constructed majority-Black districts. It is particularly inexplicable that a single precinct, VTD 6, was cut into five pieces, unless race were the predominant consideration.

86.    Additionally, the Enacted Plan's boundary lines used to split Mansfield into five different districts were also carefully drawn to protect the particular Black incumbent police jurors residing in Mansfield, as evident by how close the Black incumbent police jurors live to the edges of their districts in the following map.



87.    Particularly suspect are the boundaries of District 4-B (colored purple above), which uses a hook-shaped tendril to encompass African American Police Juror Jeri Burrell's residence at the very southern edge of VTD 59A.

88.    These facts and statistics, along with the overwhelming direct evidence of invidious racial intent, show that race predominated in the drawing of the Enacted Plan, and that existing

boundaries were split to create the highest likelihood of maintaining five majority-Black districts centered in the City of Mansfield.

89.     The Enacted Plan failed to account for obvious population shifts that had taken place in DeSoto Parish for more than two decades, particularly the northern half of the Parish, while instead giving extensive preferential treatment to the population of the City of Mansfield.

90.     Rather than adhere to traditional districting criteria, the Enacted Plan split communities of interest, particularly small majority-White towns and Census Designated Places in the northern half of DeSoto Parish. Some identifiable communities that the plan split include the tiny village of Gloster (which was split into three parts for three separate districts), and the towns of Stonewall, Longstreet, Grand Cane, and Logansport. There was no need to split any of these small places unless race were the predominant consideration.

91.     Splitting these Census Designated Places harms the ability of Police Jurors serving in northern DeSoto to respond effectively to the needs of communities and their constituents in the northern portion of the parish and denies an additional Police Juror seat to that area, even though it has grown significantly more rapidly than the rest of the parish over the past 20 years.

92.     Four jury districts can be constructed in the northern areas of DeSoto Parish without splitting any towns other than Mansfield and while maintaining communities of interest.

93.     It is clear that the Enacted Plan separates citizens on the basis of race and that race was the predominant factor motivating the Police Jury's decision to place a significant number of voters in certain districts. To do this, the Jury subordinated traditional districting criteria to considerations of race.

94.     The Police Jury's actions were not narrowly tailored and there is no compelling governmental interest to support its impermissible use of race.

28

95.     The Police Jury failed to explain or justify this predominant use of race in drawing the new districts under the Enacted Plan, including failing to explain how such racial gerrymandering was required by Section 2 of the Voting Rights Act of 1965.

96.     The parties participated in a preliminary injunction hearing on July 11 and July 12, 2023. Following the presentation of evidence, this Court found that "there is substantial evidence that the enacted police jury districting map is constitutionally inform in that race unlawfully predominated as a consideration in drawing the enacted DeSoto Parish Police Jury map in violation of the Equal Protection Clause of the Fourteenth Amendment."  Trial Transcripts, p. 252.

97.     However, due to the timing of the upcoming election, the Court declined to issue a preliminary injunction restricting the use of the map and urged Plaintiffs to obtain additional information regarding this race-based map. *Id*

## CAUSE OF ACTION

98.     Plaintiffs seek a declaratory judgment that the Enacted Plan violates the Fourteenth Amendment's Equal Protection Clause as an unconstitutional racial gerrymander. Plaintiffs have no adequate remedy at law other than the judicial relief sought herein, and unless Defendants are enjoined from using the Enacted Plan, Plaintiffs will be irreparably injured by the continued violation of their constitutional rights. Therefore, Plaintiffs also seek a permanent injunction prohibiting the calling, holding, supervising, or certifying of any elections under the Enacted Plan. Plaintiffs also provide a proposed constitutional plan. Finally, Plaintiffs seek costs and attorneys' fees.

**COUNT I**
**Violation of the Fourteenth Amendment**
**Racial Gerrymandering/*Shaw* Violation**
**(42 U.S.C. § 1983)**

99.    Plaintiffs restate and incorporate by reference paragraphs 1 through 98 as if fully set forth herein.

100.    To succeed in a racial gerrymandering challenge under the Fourteenth Amendment, Plaintiffs must show that race was the "predominant factor" in redistricting such that "the legislature subordinated traditional race-neutral districting principles . . . to racial considerations." *Miller v. Johnson*, 515 U.S. 900, 916 (1995). This can be shown through direct evidence that race was the predominant consideration, *see Bethune Hill v. Va. State Bd. of Elections*, 137 S. Ct. 178, 191–92 (race predominated where population percentage targets for the minority population were established); *Ala. Legis. Black Caucus v. Alabama,* 575 U.S. 254, 267 (2015) (same), or through indirect evidence like bizarre shapes in relation to racial demographics and densities, *see Chen v. City of Houston*, 206 F.3d 502, 507 (5th Cir. 2000), "cracking" and "packing," *Thomas v. Bryant*, 938 F.3d 134, 158 n.119 (5th Cir. 2019), or disregard of traditional criteria like compactness, *Prejean v. Foster*, 227 F.3d 504, 512–14 (5th Cir. 2000).

101.    If Plaintiffs make a showing of racial predominance, as they have done here, the burden shifts to the Defendants to demonstrate that their use of race in the challenged districting plan was narrowly tailored to serve a compelling governmental interest. *See Shaw v. Reno*, 509 U.S. 630, 653 (1993). A Police Jury's mistaken belief (even if well-intentioned) that Voting Rights Act Section 2 required the maintenance of a certain number of majority-Black districts does not shield it from liability under the Fourteenth Amendment. *See, e.g.*, *Jacksonville Branch of the NAACP v. City of Jacksonville*, 635 F.Supp. 3d 1229 (MD Fla. 2022),  ("[R]acial sorting—even

30

when done with good intention—violates the Constitutional mandate of the Equal Protection Clause if it cannot survive strict scrutiny.").

102.    The Supreme Court has further explained that, when a federal court implements a remedial redistricting plan after declaring an existing scheme unconstitutional, and the state legislature later enacts its own plan, the legislative plan becomes the governing law only if it meets constitutional and statutory requirements. *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 416–17 (2006). In other words, if a new map relies on the structure or logic of a flawed prior plan and fails to meet constitutional standards, that reliance can undermine the legitimacy of the new map. The Court's decision underscores that any legislative plan must independently comply with all legal requirements, regardless of its connection to a preceding map.

103.    Direct record evidence demonstrates that the Police Jury separated citizens into different voting districts on the basis of race when creating the Enacted Plan. Specifically, members of the Jury and their demographer Mr. Hefner indicated that their intent in drawing the Enacted Plan was to maintain five majority-Black districts in DeSoto Parish, and that they believed prevent minority retrogression and keeping incumbents in their existing districts was required by the Voting Rights Act.

104.    However, once a court determines that a state actor has engaged in purposeful discrimination, the "racial discrimination [must] be eliminated root and branch." *Green v. County Sch. Bd.*, 391 U.S. 430, 437-438 (1968,). The proper remedy for an unconstitutional exclusion aims to "eliminate so far as possible the discriminatory effects of the past and to bar like discrimination in the future." *United States v. Virginia*, 518 U.S. 515, 547 (1996) (emphasis added) (internal quotation marks and brackets omitted).

31

105.    The Police Jury and their demographer drew the Enacted Plan with the expressed intent of preserving these five majority-Black districts even though the Parish District Attorney Mr. Adams publicly advised them on multiple occasions that preventing minority retrogression is no longer a sufficient justification under the Fourteenth Amendment for sorting voters based on race.

106.    The map itself also demonstrates that race was the predominant consideration in the drawing of each of the Police Jury districts under the Enacted Plan, while subordinating to race other traditional districting criteria, such as compactness, respect for communities of interest, equalization of population, respect for political subdivisions, and other considerations. Race predominated by drawing the Enacted Plan in a way that under-populated four of the five majority-Black districts while overpopulating all but one of the majority-White districts. The districts' bizarre shapes with non-compact geographic boundaries, unusual splitting of precincts, dividing of Mansfield into five majority-Black districts and packing White VAP in the northern third of the Parish also demonstrate predominant racial intent.

107.    There is no compelling interest that justifies the racial predominance in the drawing of the Police Jury districts under the Enacted Plan. Because (1) the Police Jury never had a qualified expert analyze whether Section 2 of the Voting Rights Act requires any, let alone five, majority-minority districts, and (2) the Voting Rights Act does not require maintaining five majority-minority Police Jury districts. *See, e.g.*, *Jacksonville Branch of the NAACP v. City of Jacksonville*, 2022 U.S. Dist. LEXIS 186736, at *139 (M.D. Fla. Oct. 12, 2022), *stay denied*, 2022 U.S. App. LEXIS 30883 (11th Cir. Fla., Nov. 7, 2022), *appeal dismissed*, 2023 U.S. App. LEXIS 9255 (11th Cir. Fla., Jan. 12, 2023) (A "very understandable desire" by a local government "to assure continued minority representation" by preventing retrogression is not enough to withstand

32

constitutional scrutiny); *see also id.* ("[R]acial sorting—even when done with good intention—violates the Constitutional mandate of the Equal Protection Clause if it cannot survive strict scrutiny.").

108. By failing to hire a qualified expert to analyze whether Section 2 of the Voting Rights Act requires five majority-minority districts, the Police Jury had no basis, much less a "strong basis in evidence" to justify drawing the Enacted Plan district boundaries primarily based on race. *See Walters v. Bos. City Council*, 2023 U.S. Dist. LEXIS 79582, at *36 (D. Mass. May 8, 2023); *see also id.* (a local government's "emphasis on 'opportunity districts' may reflect a good faith misunderstanding that Voting Rights Act compliance requires redistricting based on racial demographics").

109. As such, Defendants do not have a compelling justification for the predominant use of race in the drawing of the new districts. The Enacted Plan is not narrowly tailored to further a compelling government interest.  The racial predominance in drawing of the Police Jury district boundaries violates the Fourteenth Amendment. *See Shaw*, 509 U.S. at 648.

110. Defendants are actors under color of state law who established and maintain these districts.

111. Accordingly, Defendants were and are acting under the color of state law and continue to violate Plaintiffs' constitutional rights, violating 42 U.S.C. § 1983.

**FEES, COSTS, AND EXPENSES**

112. In accordance with 42 U.S.C. § 1988 and 52 U.S.C. § 10310(e), Plaintiffs seek to recover attorneys' fees, expenses, and costs incurred in bringing this action.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request that the Court:

(a) Issue a declaratory judgment that the Enacted Plan is an unlawful racial gerrymander, and that race was the predominant consideration in the drawing of the DeSoto Police Jury Districts map in violation of the Fourteenth Amendment;

(b)  Preliminarily and permanently enjoin Defendants from calling, holding, supervising, or certifying any elections under the Enacted Plan;

(c) Set a reasonable deadline for Defendants to enact or adopt a new reapportionment plan for Police Jury districts in DeSoto Parish that complies with the requirements of the Fourteenth Amendment;

(d) Assume jurisdiction if Defendants do not act by this deadline, appoint a special master (if necessary), and draw constitutionally compliant Police Jury districts;

(e) Award Plaintiffs their costs, expenses, disbursements, and reasonable attorneys' fees incurred in bringing this action, in accordance with 52 U.S.C. § 10310(e) and 42 U.S.C. § 1988;

(f) Retain jurisdiction over this matter until Defendants have complied with all orders and mandates of this Court necessary to cure the violations; and

(g)  Grant such other and further relief as the Court may deem just and proper.

Dated: June 25, 2025

RESPECTFULLY SUBMITTED:

/s/ *Reid A. Jones*
Reid A. Jones (#34611)
WIENER, WEISS & MADISON APC
330 Marshall Street, Suite 1000
Shreveport, Louisiana  71101
Telephone:      (318) 226-9100
Facsimile:      (318) 424-5128
Email:          rjones@wwmlaw.com


        -AND-


HOLTZMAN VOGEL BARAN TORCHINSKY
 & JOSEFIAK, PLLC
Jason B. Torchinsky* (VA Bar # 47481)
2300 N. St. NW, Ste. 643A
Washington, D.C. 20037
Telephone:      (202) 737-8808
Email:          jtorchinsky@HoltzmanVogel.com

Dallin B. Holt (AZ Bar # 037419)
2555 E. Camelback Road, #700
Phoenix, Arizona 85016
Telephone:      (602) 388-1262
Facsimile:      (540) 341-8809
Email:          dholt@HoltzmanVogel.com


*Counsel for Plaintiffs*

35

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been served upon counsel for Defendants by operation of the Court's CM/ECF filing system.

Thus done this 25th day of June, 2025, in Shreveport, Louisiana.

/s/   Reid A. Jones